Good morning, and may it please the Court. My name is Jim Jellison. I represent former Yavapai County Supervisor Chip Davis and Yavapai County itself. The issue before this Court is whether a reasonable public official in Supervisor Davis's position would look at what the clerk of the board, Anna Wayman-Trujillo, did or said and conclude, is this person acting as a private citizen or is she acting as a public employee? And I can do a bad thing without fear of consequences if she's one but not the other. But the thing is bad no matter what. The only question is whether or not it's private speech or employee speech. Well, that's the state of the law. So Garcetti v. Sabalos makes it clear, and the many, many cases that follow it, in addition to the cases that this Court has handed down after Garcetti, says this, that the first amendment protection applies if you're acting as a private citizen. But if you're just acting as a public employee, it does not. Yeah. No, I understand that. And it's my question is a little bit different. And I think I understand your answer, what your answer is going to be. And I think I probably agree with it. But I want to point out the following. The ordinary function of the qualified immunity doctrine is that we seek to protect officers who are behaving in good faith without knowing that what they're doing is wrong, because — and it's got to be pretty clear that what they're doing is wrong before we will hold them responsible and get past qualified immunity. I get that. Here, it's very clear to me, based on the narrative that we've got in the complaint, that Mr. Davis did something wrong, and he darn well knew it was wrong. The only issue that is of any sort of legal difficulty is whether or not the speech by the plaintiff was employee speech or private speech. But Mr. Davis was under no illusion that what he was doing was a good thing. Well, Your Honor, I'm not prepared to concede that, even taking into account the allegations of the complaint and treating them as true. And the reason I say that really segues into something I don't intend to segue into right away, and that is the adverse action. Is this truly an adverse action, or does Supervisor Davis have the right, if he did it, and he doesn't like what the clerk is proposing as an alternative? Well, I mean, the narrative in the complaint, and I mean, true or not, I don't know. But the narrative in the complaint is, as soon as the plaintiff comes to Mr. Davis and says, the firm your wife is running has got real problems, and we think — and I think maybe we should bring it in-house, he immediately goes after her. And the cause and effect is unmistakable. If you're speaking about the July 1st meeting, where Ms. Weyman Trujillo goes to Supervisor Davis and explains that, hey, I think this special district, or these two special districts, they're running out of money, and I think that we need to manage these in-house, he then sends two e-mails out on the July 1st and July 2nd. If that's what you're referring to, there does appear to be that cause and effect. But his — It's pretty unmistakable. But his ability to do what he did, I think, is also established by Ninth Circuit precedent, and I do want to get into that. But I'm troubled with the public official versus private citizen part of this case based on the allegations of the complaint. And I get it. We are at the complaint stage. But I'm looking at paragraph 114 of this complaint, and it says this. It says, Plaintiff reminded Chairman Brown, and he's the chairman of the County Board of Supervisors, Plaintiff reminded Chairman Brown that she was performing the tasks the board had directed her to perform regarding the IDS contract issue and that she had not been asked to stop working on it. And I'm — this would be in our appendix, ER 81 and 82. The next paragraph, 115, Plaintiff also told Chairman Brown that Supervisor Davis had taken three shots across the bow at her during the September 21 meeting and that she resented being harassed. Now, by the time Ms. Wayman-Trujillo, according to her own allegations, says that she informed Chairman Brown, hey, I'm just doing what you told me to do. I'm just doing my job. Your Honor, that July 1st meeting had already taken place, and the July 1st and 2nd communications from Supervisor Davis had already taken place. There had been an executive session and a public session at that point in time where Ms. Wayman-Trujillo threw out her plan on how to deal with the district running out of money. And even then, she's saying, hey, I'm acting as an employee. I'm doing what you, as my boss, told me to do. I just don't see how, in any analysis of the facts of this case, Supervisor Davis, when he met with Ms. Wayman-Trujillo on July 1st, could have looked at her and said, oh, you know what, you're not acting as a — as the clerk of our board. You're acting as a private citizen here, meeting with me in my office, telling me what you're going to share with the other board members at an executive session. I mean, it would literally go beyond the pale to suggest that Supervisor Davis should have looked at her on July 1st and said, oh, yeah, you must be acting as a private citizen here. And I say that taking — What do you make of the argument — I'm not sure I'm convinced by it, but what do you make of the argument that she shouldn't have been talking to him, or at least we'll say it this way, because he was recused and not appropriately a part of the deliberations on this point, she was not coming to him in her capacity as an employee? Well, what your question suggests is that there was clearly established law that would have alerted Supervisor Davis that maybe if I hadn't recused myself, what you're telling me is in your role as a public official, but because I've recused myself on this issue, now your role is speaking to me as a private citizen. What about the auditor that she went to? The auditor general issue, you know, Your Honor, you're raising a point now that counsel and I had talked about before this oral argument, because maybe it goes a little bit beyond what we're — what are in the four corners of this complaint. But I asked, you know, are you raising the auditor general reports as a basis for your First Amendment retaliation claim? First of all, we can go to the complaint and we can see that there's no allegation whatsoever that Supervisor Davis was ever aware of those auditor general letters during the course of Ms. Wayman-Trujillo's employment, in other words, before she resigned her employment. The reality is nobody at the county knew about those. Going outside of the complaint a little bit here, those turned out to be anonymous letters to the auditor general. I in fact did a public records request. I know I'm going outside of the complaint when I tell you this. They didn't give me those letters. But I think that Appellee's counsel will tell you that that is not a basis that they are alleging for the First Amendment retaliation case. But for purposes of this Court's review, there is no allegation that Supervisor Davis was even aware of any, if there were any, communications between Wayman-Trujillo and the auditor general or the attorney general. Is there a private remedy here? I mean, what we're talking about with qualified immunity is a federal constitutional remedy to protect whistleblowers, as the plaintiff here claims to be, from retaliation. As I recall, California has some sort of whistleblower statute so that even if she has no federal constitutional remedy, she still has a remedy under State law if it turns out that she really is a whistleblower. Is that true? Arizona has something called the Arizona Employment Protection Act that's codified at Title 23, Section 1501, that provides, among a number of remedies, a whistleblower remedy for people who violate or who report violations either of the Arizona Constitution or an Arizona State statute. In addition, you have the common law claims that Garcetti v. Zabalos talked about. If you think that somebody's lied about you, you can pursue defamation. But there are those claims. They were not pursued in this case. And so going back, Your Honor, to your question about the recusal, there is no clearly established law that somehow changes Ms. Wayman-Trujillo's status as either a public official or somebody whose speech is owed to their duties simply because somebody on the board or the governmental body happened to recuse him or herself from a particular issue. Again, Davis wouldn't have any clearly established law to look at and say, hey, because I recused myself, all of a sudden, ta-da, you are a private citizen when you're talking to me. What about the argument that she has been told by the county administrator, who I assume within the sort of the hierarchy, he's the hiring and firing guy, I mean, she's an employee, she's not an elected official. The county administrator sounds to me as though he's the guy in charge of that group of hired employees. Bordone comes to her and says, don't do this. So what she does after that is really going against what she has been instructed to do. Well, Bordone actually says you should hold off on your recommendation about ending the contract with this third-party administrator. What Ms. Wayman-Trujillo does is says, no, I'm not prepared to hold off, I'm going to do it anyway, and she goes to the chairman of the board. In actuality, Bordone is not her boss, not her supervisor. She, as the clerk of the board, reports directly to the governmental body, the clerk of the board, the board of supervisors. And as alleged in the complaint, the chairman of the board is sort of the natural person who is her de facto go-to person for direction. And she goes to him. And who has the hiring and firing authority over her? Is it Bordone or is it Brown? The board as a whole has the ultimate authority. So, again, we have an employee who is identifying a problem with the district. She's going to the people that she needs to go to to remedy that financial problem. She's meeting with people. She's appearing at public sessions. And by the way, she's not saying that there's crooks out here or there's theft. She's saying, hey, as a practical matter, you're running out of money. The accounting, we probably should use an accounting software. And by the way, I really don't want to do this job anymore. We should hire somebody separately as a special district's coordinator to handle these things. When you look at the totality of this complaint, it is clear as day that she owes her speech to her public employment. And cases like Coombs and Kennedy, you know, the football coach who goes and prays at the 50-yard line, I doubt very seriously that his job description talked about going out to the 50-yard line and praying. Yet, this court says that that speech, the kneeling and the praying, owes itself to your position as a football coach. Likewise, what Ms. Wayman Trujillo did here owes itself to her position as the clerk of the board and the special district's coordinator. On adverse action, this case may, in fact, be a great opportunity for this court to harmonize Coles-Alter and Nunez and Ginni and Mulligan and Blair v. Bethel, which talks about First Amendment protections or the lack, you know, when somebody's in a public meeting is voted from being a vice president of the board, those cases that talk about the right of public officials to actually engage in free speech in response to free speech. In this case, that's all that Supervisor Davis did. Is he, whether you call it right or you're wrong, he was criticized. He chose to criticize back. The action of... You know, that's a very nice way of characterizing what he did. Well, if you look at the Blair v. Bethel case, if you look at the Ginni case... I'm not looking at those cases. I'm looking at the facts alleged here and the way you characterize them, saying you characterize them in a very nice way. Well, politics is harsh, and the Blair case says that. And people that play in politics, whether they're the politicians or the people working directly for them, they need to have thicker skin. And that's not me saying it. It's what the Blair v. Bethel case says. The political arena is different. I'd like to reserve a minute. Okay, you got it. If I could. Thank you. May it please the Court, my name is Edmundo Robina, and I am here on behalf of the appellee Anna Wayman-Trujillo. Did I hear your opponent correctly when he said that you are not going to raise the issue of the Arizona Auditor General or the Attorney General? Yes, Judge. The... When Ms. Wayman-Trujillo sent the notice of constructive discharge under State law, at the same time, she sent letters to the Auditor General and to the Arizona Attorney General's office, but she didn't sign them. She put her phone number on the one to the Attorney General's office, so she was afraid. The only reason that we raised that below was because it's just to show that basically the characterizations she was making weren't only for personal purposes. When she raised the issues of, in her constructive discharge notice, of the conflicts of interest, board member conflicts of interest, violation of open meeting laws, and the accounting irregularities, it wasn't only for the purpose of saying, I'm raising a constructive discharge. I would like to address the issue of constructive discharge and wrongful termination that Judge Kleinfeld asked about. Arizona does have a wrongful termination law, which is what Mr. Jellison was talking about, ARS 23-1501, but it only deals with cases of termination. It also has a constructive discharge law that says that you have to give notice, 15 days notice, to the employer of intolerable circumstances and allow the employer an opportunity to respond. That is what Ms. Wayman Trujillo was doing when she sent her notice of state law constructive discharge. This case involves a series of disclosures. Hold on right there. Yes, sir. Let me tell you what I'm thinking about tentatively at this point in the argument, and you can educate me so that I get it right. What I'm thinking is, she's the special district administrator. She routinely reports to the board. She reports to the board that based on her examination of revenues and expenditures, the special districts are being bled dry by Supervisor Davis' wife's company, which has just raised rates and it's costing a fortune. She certainly makes it clear, as it seems appropriate, that she doesn't think it's right that a supervisor's wife, who used to work for the county, is now bleeding it dry so it can't pay its bonds. That's basically the gist of it. I can't see why that isn't her job. It's a very unpleasant thing to have to do. That happens in people's jobs all the time, all kinds of jobs, where you have to do something that you know is going to create a whole lot of trouble for yourself. Now, it looks to me like what the Supreme Court did in Garcetti is they said a government employee is not entitled to constitutional protection in that situation, where a private employee would not be entitled to constitutional protection. It's in the course of her job. It's an unpleasant thing. There's going to be blowback, but the Constitution doesn't address it. It seems like that's what they said. Arizona has these private remedies, so it's not like it's totally unaddressable or unredressable. Why isn't that the end of it? Well, because when Ms. Wayman Trujillo, the way this came about was she learned that the accounts for those two special districts, that they were going to run out of money before the bonds were paid off. But in her discussions with the finance manager, the county finance manager, that's where she learned that there were accounting irregularities and that the books weren't matching from one year to another. It was the finance director's job to deal with that issue, not Ms. Wayman Trujillo. Ms. Wayman Trujillo's duties included talking with the person in whose district the special district was, which was Chairman Brown, or who later became Chairman Brown, the person later became Chairman Brown, and to speak with the board regarding issues related to the special districts. But she did not have a freestanding duty to discuss accounting irregularities from the contractor. So the answer to it is basically go through her job description and find something in what she did that's outside her job description. Well, it's not only that, Judge Kleinfeld. The other piece of this is when she went to the administrator and she talked to him about these problems with IDS, which was Mrs. Davis's company, he then went to Mr. Davis and talked to Mr. Davis about these issues. And Mrs. Wayman Trujillo was also aware that the finance director had given Mr. Davis finance doubts. Of course. Once you report that there's something fishy about somebody powerful, you can expect some nasty blowback. Correct. The problem that I have is, as I understand the evidence here, her job description included consulting with reviewing the invoices of and authorizing payment for outside services to special districts, and also presenting special district information at board meetings. That seems broad enough. So whether it's just an unwise decision to farm this out, or whether it's corruption or whatever, the special districts don't have the money to pay Davis's wife and still pay what they have to pay on bonds and stuff. I don't see why it's outside her job description. Because the description is so broad. It only began there. When Mr. Davis recused himself, he had no business discussing with her the issues related to IDS. And yet, he basically required her to come speak with him, and then required her, or told her, through Mr. Bourdon, that she should not continue these issues. And when he says that he should not do it, remember that he had, everyone knew that this was a gentleman who had the propensity to retaliate and had done it in other occasions. And he is a recused person with a conflict of interest saying to her, it's going to hurt me personally, don't do it. And she went to the chairman of the board and said, I feel like that was a warning to me not to do this. That was only the beginning of the conversations with regard to this. She then, because she felt she had to, persisted with raising the IDS issues. And all of the board members knew that Mr. Davis was retaliating against her, and one of them specifically said to her, look, he's going to get what he wants. He's done this in the past. And then when she went to him, basically she sent him a courtesy email saying, look, I'm going to raise these IDS issues so that you can recuse yourself. That wasn't part of her job to do that. And then he immediately retaliated against her. When she raised the issue of constructive discharge in which she raised all of these issues again, he retaliated against her again. And once she did that, the board then, they investigated. I see why it wouldn't be part of her job. I mean, you're expecting to raise something in front of the board that's going to make Davis really mad. So you give Davis a heads up on it in hopes of keeping him from causing too much harm to you, a judgment decision that somebody might make as part of raising the problem before the board. And, Judge, even if it was normally part of her duties, the fact that she defied his directive and that he began harassing her under Dahlia indicates that it no longer is part of her duties. He defied her directive, not his. She defied his directive. Isn't it just a duty involves creating an issue with a very powerful individual? The powerful individual starts a campaign of trying to deter or damage the person who's raising the issue. But it's still her job to raise the issue. Because from her point of view, Davis and his wife are bleeding the special districts dry and that's her bailiwick and she has to do something about it, even though it's going to cause trouble for her. But that's not the only issue she's raised. Now, as time goes on, she's also raising the issues of the fact that open meeting laws are being violated because he's clearly hearing more things about what's going on inside these executive sessions. And she's also raising the fact that he has a conflict of interest, but he's not stopping what he's doing with respect to IDS. And she's also raising the issues to the other board members of these accounting irregularities and he continues to . . . he doesn't get a free pass just because he's a board member to Dahlia. I'm supposing . . . I'm hypothesizing in my mind the opposite. Suppose she decided, while Davis and his wife are bleeding the county dry, it's at best a bad approach for the . . . I mean districts . . . for the special districts to take and at worst it's crooked, corrupt. I think I'll do nothing about it because Davis could hurt me and it could cost me my job. It seems to me that at that point, she runs the risk that if this does come out from somewhere else, like if the papers get a hold of it, she winds up being in trouble because it was her job to raise this and she just pretended to be deaf, dumb, and blind and she didn't do anything about it. At some point, it's in the mix of her job and the finance manager's job to raise issues with respect to special district. The finance manager specifically with regard to finance issues. But it goes beyond that when she starts raising issues of conflict of interest and violating violations of open meeting law. So at what point does she raise conflict of interest and at what point does she raise problems with open meeting law? Prior to her constructive discharge . . . No, I don't . . . . . . notice. Can you be more precise than that? I cannot on the record, Your Honor. Because those things do seem to be outside of her job description and if she's getting retaliated against because she says, Davis, you're continuing to be involved and you're involved in violation of conflict of interest rules, that sounds like it's outside. So I want to know as best you can precisely when that happened. It happened, I believe, in between the time that he . . . when he went after her the second time when she . . . And I've got the complaint here in front of me. Do you know where it is in the complaint? It's going to . . . I can't tell you. Take a minute if you can. The closest it comes, Your Honor, of actually saying when that occurred is that it says in the notice of constructive discharge on paragraph 139 at excerpt 84, it says in her October 16, 2015 letter, plaintiffs specifically referred to her belief that Supervisor Davis's abusive and retaliatory actions stem from her disclosures to Bourdon and board members of possible open meeting law violations, conflict of interest violations of a board member, and possible inaccuracies and accounting violations regarding Coyote Springs and Poquito Valley. So that's the first place that it's actually mentioned in the . . . but it's referring to conversations that she had with board members and referring to conversations that she had with Mr. Bourdon. And the other conversations that she had with Mr. Bourdon are specifically stated in the complaint. So where do we have conversations where she's alleging conflict of interest? Let me start with the one that I can tell you right away. Yes, sure. On ER-74 at paragraph 49, in the April time frame, plaintiff discussed with Bourdon and Fields, who was the assistant county administrator, several concerns the plaintiff had regarding Coyote Springs, Poquito Valley, including the financial problems, IDS sloppy accounting practices, and the year-end accounting irregularities. And then in also towards the end of this, in ER-87 at lines, or I'm sorry, at paragraphs 161 and 162, Ross, the HR director, asked if plaintiff had any other concerns about violation of open meeting laws. Plaintiff said that she had. Kennedy, but that's so late. What I'm interested in and what would help you is any specific allegations in the complaint where you say that she talked about, to Bourdon or somebody else, about Davis's conflict of interest. And so far, you have not given me much. I'll, I'll give you another one. In, in I mean, I understand that Davis did have a conflict of interest, but what I'm interested in is, did she say, you have a conflict of interest, or did she say to Bourdon or to Brown or anybody else, he has a conflict of interest? She reiterated to Bourdon later that Well, okay. I, I, I'll, I'll read the, I read the complaint before coming up, but I wasn't focused on that issue, but I can, I can read it again. Do you mind if I take another? Oh, please, please, yeah. I'm having trouble finding the constructive discharge. As far as I can tell, her duties were changed so that basically she wouldn't be reporting to the board anymore about Davis and his wife funneling money out, that the special districts needed to pay their, the interest on their bonds. So I understand that she was reassigned, but her pay wasn't cut. She wasn't shamed in some way, being assigned to be the janitor for the high school gym or bathroom or something. She wasn't given a job where she'd have to commute two hours each way instead of one that was just a 15 minute commute. Her pace, since her pay wasn't cut, none of these other things were done to her. I'm having trouble seeing why it's a constructive discharge. Because constructive discharge can happen with a series of events over a long period of time. But what events make it up? I mean, the fact that people that she criticized, criticized her, by itself doesn't seem like a constructive discharge. What else has she got? So he went to the board, to all of the assistants of the board, to all of the assistants of the board, to raise the issue. The day after she talked with him, the first thing he did was to claim that she was taking this unnecessary trip. Well, I'm sure that he would have liked to get her fired with a bad recommendation, but it didn't happen. He, he, it was a little progressive. So the next day, he sought to inquire as to whether or not she could be fired for, because her son, 13 years before, in high school, had worked for the, for the county elections department. After she raised the issue, or let him know, basically, that she was going to raise the issue of the IDS with the, with the board, he then sought to kick her out of, of an executive session. She has a statutory duty to be in the executive session. And he raised issues claiming that she was overpaid, essentially, and that she didn't do her job. And, and then when, when the executive session was over and claiming that she was trying to create some sort of, of, of an empire for herself by trying to bring the, the jobs in-house. And she did this in public, he did this in public in a, in a, in a public meeting. And then he sought to, to have an executive session regarding her job duties and her, and her, to, to, to look into her performance. And at that point, there, I mean, this was a, there were a number of things that he did. And everyone knew, Judge Kleinfeld, all of the board members knew that he was doing these, these things for retaliation. And that he had a propensity to do it, the, the HR director said to her, the HR director said to her, herself, if it were me, I would quit. You know, and under those circumstances where the board member is saying to her, you know, Judge, you know, he's going to get what he wants. And the last person that met with him was fired. You know, and under all of these circumstances, it's, it's a constructive, it can be a constructive discharge. And under Arizona statute, what you have to do is you have to give him notice. I'm sure that in those executive sessions, he was saying, we've got to fire this person. And they didn't. The fact is, she beat him. Well, I mean, she beat him because then they started taking away her job duties. They, they, they started taking away her job duties. They started going around her to the, to the, to her underlings. And they started talking about, figuring out how they could take away duties and, and send them to different departments. Once she sent her letter of constructive discharge, then the board that had acknowledged previously that, yes, he was retaliating, all of a sudden sort of turned away from her, as if, you know, you went too far now. You, you've, you've done this thing. And they started going around her. They quit talking to her. They started taking duties away. So, I mean, it was a series of things. It wasn't just, and that's when she left. Thank you. Thank you. Your Honor, if you're looking at the complaint to see if there is an allegation that states a plausible claim that there was an open meeting law issue raised that, that Davis was aware of, or a conflict issue that was raised by Wayman Trujillo that Davis was aware of, it's not there. Well, I looked for it. I've been looking for it. I guess I'll look for it again. And I, and, and I, I look for it. And the only thing I see is in her October 16th letter, she mentions that that's part of her constructive discharge. After that letter, that constructive discharge letter, two things happened on the same day. She was asked to leave an executive session where her own employment was being discussed. And she was told that the responsibility for overseeing the IDS contracts were going to be moved to public works, something she wanted to have done anyway. These are not adverse actions. We're asking this court to make the practical inquiry that the district court failed to do. Find that Mr. Wayman Trujillo is alleging public speech, was not subjected to adverse action, and reverse the district court's ruling denying qualified immunity. And if so, also as to Yavapai County, if this court finds it, there's no constitutional violation at all. Thank you. Thank both sides for their very useful arguments. Wayman Trujillo versus County of Yavapai, submitted for decision. And last but not least, Navarro versus Sessions.
judges: D.W. Nelson, Kleinfeld, W. Fletcher